# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PENLAND, MORRIS, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist TONEY E. HENDERSON, JR.**
**United States Army, Appellant**

ARMY 20210543

Headquarters, 7th Infantry Division
Larry A. Babin, Jr., Military Judge
Lieutenant Colonel Robert A. Rodrigues, Staff Judge Advocate

For Appellant: Captain Matthew S. Fields, JA (argued); Colonel Michael C. Friess, JA; Lieutenant Colonel Dale C. McFeatters, JA; Major Mitchell D. Herniak, JA; Captain Matthew S. Fields, JA (on brief); Colonel Michael C. Friess, JA; Major Mitchell D. Herniak, JA; Captain Matthew S. Fields, JA (on reply brief); Jonathan F. Potter, Esquire; Major Mitchell D. Herniak, JA; Captain Matthew S. Fields, JA (on supplemental brief).

For Appellee: Major Jennifer A. Sundook, JA (argued); Colonel Christopher B. Burgess, JA; Lieutenant Colonel Jacqueline J. DeGaine, JA; Major Pamela L. Jones, JA; Captain Lisa Limb, JA (on brief); Colonel Christopher B. Burgess, JA; Major Andrew M. Hopkins, JA; Captain Lisa Limb, JA (on supplemental brief).

24 August 2023

---------------------------------
OPINION OF THE COURT
---------------------------------

PENLAND, Senior Judge:

Where an accumulation of mistakes materially prejudices an appellant's substantial—and, in some respects, constitutional—rights, we grant relief.

---

[1] Judge ARGUELLES decided this case while on active duty.

A panel of officers and enlisted members convicted appellant, contrary to his pleas, of one specification of rape of a child, one specification of sexual assault of a child,[2] one specification of assault consummated by a battery upon his spouse, one specification of abusive sexual contact, one specification of disorderly conduct, and one specification of indecent conduct, in violation of Articles 120b, 128, 120, and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 920b, 928, 920, 934. The military judge sentenced appellant to confinement for a total of 198 months,[3] reduction to E-1, and a dishonorable discharge. The convening authority took no action on the findings and sentence on 9 November 2021 and the military judge entered judgment on 10 December 2021.

We review the case under Article 66, UCMJ. Appellant raises two assignments of error, both of which merit discussion and relief.[4]

## BACKGROUND

### A. Pretrial Proceedings

Before trial, the defense filed a motion to exclude Military Rule of Evidence (Mil. R. Evid.) 413 evidence of alleged sexual misconduct against ███ (hereinafter referred to as "413 victim"), allegations that resulted in acquittal at an earlier general court-martial. Responding on 2 June 2021, the trial counsel wrote:

> [A] DNA report[5] by [███], Forensic Scientist, Washington State Police (hereinafter referred to as "DNA expert"), found that the 'DNA profile obtained from the non-sperm fraction of [413 victim's] perianal swabs is of mixed

---

[2] After findings, the military judge conditionally dismissed this specification without prejudice, subject to the rape specification's surviving appellate review.

[3] The military judge sentenced appellant to 180 months of confinement for the rape specification, 9 months for the assault consummated by battery specification, and 9 months for the abusive sexual contact specification, all to run consecutively. The military judge imposed no confinement for the disorderly conduct and indecent conduct specifications.

[4] We have fully and fairly considered appellant's remaining matters under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); they merit neither discussion nor relief.

[5] The report was included with the government's motion response.

origin . . . consistent with the combined known profiles of [413 victim] and [appellant].'[6]

Trial counsel briefly described the 413 victim's testimony from the first court-martial. He also wrote:

> [T]he fact that the [appellant] faced prosecution for a similar offense, negates any reasonable mistake of fact defense. Additionally, the facts suggest that the acquittal emboldened the [appellant] to escalate his tactics.

On 5 September 2021, the military judge denied the defense motion regarding the 413 victim, writing:

> Other than the fact of acquittal and an assertion that the [appellant]['s] sworn statement to the police was in contradiction to [the 413 victim]'s report, no exculpatory evidence was presented to this Court for consideration of this matter. Despite the obvious reasons that this factor [intervening circumstances] may weigh against admissibility as asserted by the Defense, *the Government argues that when considering that the charged offenses occurred after the acquittal, the [appellant's] tactics were emboldened and this factor weighs in favor of admissibility. The Court finds this factor to be neutral.*

(emphasis added).

## B. Trial

During their opening statements on 28 September 2021, both assistant trial counsel and the defense mentioned the previous acquittal. The government called ZL (hereinafter referred to as "victim 1"). She met appellant on Facebook, and she testified that, knowing she was too young to have an account at fifteen, she "had to lie about [her] age on Facebook." Appellant and victim 1 agreed to meet in person; he picked her up in his car and gave her a bottle of Hennessy to drink. Victim 1 testified that, at this meeting, she told appellant she was fifteen. Victim 1 testified that appellant raped her, by unlawful force.

---

[6] The government's quote from this sentence in the DNA report was technically correct, though not complete. It omitted the clause stating the DNA profile from this particular swab indicated "at least three individuals."

Appellant testified, claiming that, as of April 2019, victim 1's Facebook page indicated she was thirty years old. He testified that on 5 May 2019, the two planned to meet in the early evening, and that victim 1 wanted him to bring alcohol and marijuana for her. Appellant described his thoughts about victim 1's age:

Q. At that time, before you left to meet her, how old did you think she was?

A. I thought—I knew she wasn't thirty, sir. I thought she was 18, because in a message, she also said she was grown also, and that should be in the messages. . . .

Q. What time did you arrive at the location she sent you?

A. Around 6 o'clock.

Q. And how do you know that?

A. It was still daytime and it's still—in that message, it's still—the time is still there when I told her I was outside. . . .

Q. Where did you stop?

A. At the gas station right next to my house.

Q. And why were you going there?

A. To get the rolling papers to put the weed in, sir.

Q. How old did you have to be to buy rolling papers at that time?

A. At that time, it was 18.

Q. And what did you do when you arrived at the gas station?

A. So, I, honestly, didn't want to get out the car. So, I told her to just go in there and get it, and she told me, 'Isn't the law—isn't it part of the law that you're supposed to be 21?' And I said, 'No. They didn't change it yet. So, you still got to be 18,' and she told me, 'Well I don't have my I.D.' So, I just said, 'Well, forget it[.]' . . .

> Q. When you and [victim 1] were having sex, how old did you think she was?
>
> A. It's not how old so I think she was. She told me she was 18, sir.
>
> Q. Is that what you thought?
>
> A. That's what I was told, sir.

Appellant claimed he and victim 1 had consensual sex in his car's backseat, during which she did not seem intoxicated.

The 413 victim also testified later, pursuant to the military judge's Mil. R. Evid. 413 ruling. She described meeting appellant in the fall of 2016; she was 18 years-old and he was around the same age. She testified that in November of that year, appellant performed consensual oral sex on her in his car. According to her testimony, appellant then anally raped her. The 413 victim also testified about the incident in a May 2018 court-martial; she did not mention the prior trial ended in acquittal—neither party asked.

Appellant also addressed the 413 victim's testimony, telling the court-martial he met her near an off-post fitness center. He said they engaged in consensual sexual activity, including oral sex and intercourse.

AH (hereinafter referred to as "victim 2") testified she was born on 3 February 2003. She said appellant contacted her first on Facebook in 2018, when she was fifteen. She described their relationship's progress. They exchanged phone numbers and began texting each other in approximately February 2020. The text messages became increasingly suggestive, and by 9 February 2020, appellant and victim 2 agreed to exchange photos. Appellant texted victim 2 that night, "I got videos but I don't think you wanna see cuz somebody in it. It ain't a [f.....g] video, tho[.]" Victim 2 responded with, "[I don't care] I wanna see[.]" and "I'll send sum [right now] but send yours fast [because] next time I put my phone down I'm goin to sleep[.]" Less than a minute later, appellant sent victim 2 two videos of himself engaged in sexual intercourse with another person. Victim 2 testified that the videos made her "[u]ncomfortable" and "confused[.]" However, she and appellant continued to text each other the next day, with victim 2 asking appellant his "body count[,]" a euphemism for his number of previous sexual partners. She also generally described her sexual activity with others, and a continued willingness to engage in such activity with appellant. Victim 2 and appellant finally met in person on approximately 12 February 2020, and she testified that appellant touched her thigh without her consent.

Cross-examining appellant later, the assistant trial counsel began by asking about the 413 victim's rape allegation; the questioning eventually led to DNA analysis:

> Q. Now you had a trial on this; correct?
>
> A. Yes, ma'am.
>
> Q. And you sat and you listened to that entire trial; correct?
>
> A. Yes, ma'am.
>
> Q. And in that trial, there was DNA evidence that was presented?
>
> A. The DNA I gave up to the police department, ma'am?
>
> Q. Yup.
>
> A. Yes, ma'am.
>
> Q. And a DNA examiner testified at that trial; didn't he?
>
> A. Yes, ma'am.
>
> Q. And you heard that evidence?
>
> A. They said it was two forms of DNA, ma'am.
>
> Q. Two forms of DNA, and it was found in [the 413 victim's] anus; wasn't it?

This last question prompted a defense objection and an Article 39a session, in which the defense indicated there was evidence "around" the 413 victim's anus, but not "in" it. The assistant trial counsel responded, "I can rephrase the question to be around the anal area, that his semen was found around the anal area[.]"[7] The

---

[7] Perhaps unknown to the assistant trial counsel, this too would have been an improper question, for the DNA report did not state appellant's semen was found there.

military judge sustained the mischaracterization objection, and cross examination resumed:

> Q. You sat in a trial for this matter in 2017, correct, related to [the 413 victim]?
>
> A. 2018.
>
> Q. 2018, related to [the 413 victim] correct?
>
> A. Yes, ma'am.
>
> Q. And at that trial, a DNA expert testified; correct?
>
> A. Yes, ma'am.
>
> Q. And at the – the DNA expert at that trial found that around [the 413 victim's] anus was your DNA – two types of DNA; correct?
>
> A. Two types of DNA, and they didn't ----
>
> Q. Both yours?
>
> A. No. Both of them wasn't mine, ma'am.
>
> Q. They found your DNA around her anus.
>
> A. If I can recall, I don't even think they even found my DNA around her anus. I can be wrong, but if—from my memory, I don't think my DNA was around her anus.

After appellant's testimony, the military judge granted the defense's request for another Article 39a session, during which the defense noted the government had not provided them the DNA expert's purported testimony from the previous trial. Citing *Jencks v. United States*, 353 U.S. 657 (1957) and R.C.M. 701, the defense requested the testimony. The assistant trial counsel agreed to provide it, though she argued *Jencks* did not require it. The military judge recessed the court for the evening, so the government could determine whether it had provided the defense with a transcript or audio recording from the first trial.

The next day began with a lengthy Article 39a session, where the military judge announced, "[N]o DNA expert testified in the last court-martial involving [appellant], despite the assistant trial counsel's assertions during cross-

7

examination." After consulting with their technical chain of supervision, the defense moved for a mistrial, alleging "prosecutorial misconduct" and citing *United States v. Voorhees*, 79 M.J. 5 (C.A.A.F. 2019) among other cases.

The defense told the military judge appellant was confused during the cross-examination and "inaccurate[ly]" stated, "Both of them [DNA types] wasn't mine[.]"[8] The assistant trial counsel acknowledged no DNA expert testified in the first trial. The defense referred to its pretrial discovery request for certain prior witness statements, arguing it should have alerted the government to the absence of DNA expert testimony in the previous trial. In a somewhat confusing response, the assistant trial counsel said:

> We did, at that time, check and there was none. It was co-counsel who checked, and that's part of why it just – mine, fell on my part, but as far as checking at that time, yes, who testified.

The military judge clarified the pretrial disclosure regarding DNA expert testimony:

> Q. Did you provide everything that the government was in possession of regarding [the DNA expert]?
>
> A. Yes, Your Honor.
>
> Q. And because there was no testimony, that didn't include any testimony; is that accurate?
>
> A. Correct. Correct. Yes, Your Honor.

After asking the defense why it did not object to the government's cross-examination about the purported DNA expert testimony from the first trial,[9] the military judge asked whether either of the defense counsel had participated in it; neither had. He did not ask the same of the prosecution.

The defense argued the government's mistake was reckless:

---

[8] The military judge later indicated the government's compound questioning might have inadvertently contributed to appellant's mistaken answer.

[9] The defense responded they had "figured it's got to be true," and "immediately . . . requested" the prior testimony once the panel was excused the night before.

> They apparently did check on who testified at the last trial, and they have not and they did not disclose—they did not—they would—if they had checked, they would have seen that [the DNA expert] did not testify at trial. . . . If they had done their due diligence, they would have: One, had known that he did not testify, let alone what facts they wanted him to testify to if they had called him and confirmed whether or not he testified, they would have known this. . . . After the cross-examination, defense called [the DNA expert], and [the DNA expert] told the defense, 'No; I didn't testify. I don't think I've ever testified on base.' . . . And it was the defense that asked the government, 'Government, are you sure he testified?' And only after that did they then go look, and then immediately, as per their duty—and rightfully so—informed the court of their mistake, but they could have done this beforehand, and that's what is reckless, Your Honor.

The assistant trial counsel responded:

> While government completely concedes, and I concede, that the statement that the DNA expert testified at trial—at a previous trial was inaccurate, it was a mistake due to a bad-written note, and absolutely that . . . . [I]t was not cavalier or reckless, and it was also only focused on testing[10] the [appellant's] knowledge of the DNA evidence, and therefore, that was a minimal piece of the entire thing with relation to the whole line of questioning.

Responding to the defense's argument that the government had only checked about the DNA expert's purported testimony after the defense specifically asked, the assistant trial counsel said the government had checked on their own initiative. The assistant trial counsel also emphasized that her inaccurate notetaking on the DNA report caused her to mistakenly believe the DNA expert had testified earlier. The

---

[10] The assistant trial counsel claimed multiple times she was "testing" appellant on cross-examination.

military judge did not ask her to elaborate.[11] Naming someone other than the DNA expert, the assistant trial counsel's handwritten note reads, "[C] testified[.]"

Focusing on intent, recklessness, or negligence, the military judge discussed with the assistant trial counsel:

> MJ: It seems to me that what you're describing, maybe you're suggesting or conceding that you were at least negligent in----
>
> ATC: Absolutely, Your Honor. I do concede that I was negligent in the way I wrote my notes. Absolutely. I hesitate to use the word "due diligence" or any of those others because of the legal definitions related to them.
>
> MJ: I understand, and that's not the purpose of the court's questions. So, please, both sides, don't misinterpret what I'm doing here. I'm trying to determine whether or not a mistrial is appropriate in this case. I'm not trying to determine whether anyone has committed any professional responsibility violations or anything beyond that. That's for you and your supervisors to discuss.
>
> ATC: Understood, Your Honor, and again, that's—the only reason I would say, 'Absolutely. I was negligent in where I wrote my notes and the way I wrote my notes. Absolutely.'

Turning to potential remedies, the defense argued a curative instruction could potentially impeach appellant. According to the defense, subsequently calling the DNA expert as a witness would also inevitably reveal appellant's cross-examination testimony was not accurate. As an alternative to mistrial, the defense suggested the military judge could reconsider his decision to permit the Mil. R. Evid. 413 evidence and exclude it instead. The defense also suggested the military judge could declare a partial mistrial on the alleged Article 120 violations.

The military judge asked about the possibility of:

---

[11] Pursuant to our order, appellee obtained and attached the inaccurately noted DNA report as an appellate exhibit.

[s]ustain[ing] an objection to the entire line of questioning pertaining to DNA evidence at the prior trial; [i]nstruct[ing] the panel to completely disregard that evidence; and . . . tie the government's hands and prevent them from offering any evidence pertaining to DNA as it relates to [the 413 victim], how then would the [appellant] be prejudiced?

The defense argued that was a "scorched earth" option, because "there is actual exculpatory evidence about the [the 413 victim] issue in the DNA that now we can't even get into[.]" The military judge then learned, from the defense, that the DNA report indicated three contributors [including the 413 victim], not just two.[12] The defense continued to describe the exculpatory information to the Court, explaining that appellant's DNA was not found on the perineal, vaginal, and anal swabs from the 413 victim. Asked by the military judge about this additional information, the assistant trial counsel said, "[T]hat would be what we would elicit—we would have elicited from [the DNA expert] as well."[13]

The assistant trial counsel also emphasized to the military judge:

I think it's very important that it's not, 'They both weren't mine.'[14] That's not what he said, and I agree with what he was saying, which, 'They weren't both mine', when I said 'Both yours,' and then he said, 'They weren't both mine,' and immediately responded to that answer.[15]

---

[12] This depended on the swab examined.

[13] Regarding how the DNA expert "would have" testified, it is unclear whether the assistant trial counsel was referring to: how she would have pursued different tactics if prosecuting the case-in-chief anew; the government's potential rebuttal case; or, something else. On the other hand, the defense clearly stated they would not have raised the DNA evidence, but for the government's cross-examination of appellant about it.

[14] Actually, appellant *did* testify to this effect—almost verbatim.

[15] There were problems with this bit of advocacy. First, the prosecution's question inaccurately suggested only two DNA contributors on the perianal swabs; the DNA report indicated three. Second, the assistant trial counsel misstated what appellant said. Appellant testified, "Both of them wasn't mine, ma'am."

The military judge then asked for the defense's position whether he should prohibit the assistant trial counsel from continuing to represent the government in the case. The defense initially demurred, but the military judge said, "I need to know your answer." The defense ultimately indicated nothing short of a mistrial— particularly not precluding the assistant trial counsel from further action—would be adequate.[16]

After a recess, the military judge denied the motion, stating he would "provide written reasons for the decision I'm about to announce prior to authentication of the record."[17] He informed the parties he would instruct the panel to:

> [C]ompletely disregard all questions and answers during the cross-examination of the [appellant] that pertain to DNA or testimony in a prior trial about DNA. Such testimony cannot be considered by you for any purpose and should be completely disregarded.

The military judge also ordered the government not to offer any DNA evidence regarding the 413 victim. However, the defense clarified that, depending on whether they elicited that DNA evidence in appellant's case, they might "open the door" to the government's also using it. The military judge confirmed that possibility, saying he would convene a subsequent Article 39a session to discuss it if necessary.

Less than ten minutes before the court-martial convened for closing arguments on 2 October 2021, the trial counsel provided the defense with a 120-page PowerPoint presentation he intended to use. The defense had several objections to the slides, including one (numbered 7) plainly suggesting that appellant's prior acquittal "[e]mboldened" him, causing him to "[l]earn[] from mistakes" and use "[n]ew tactics[.]" The military judge, obviously displeased with the trial counsel's confusing explanation of numerous slides, told the government:

---

[16] Under the circumstances, we do not interpret this as abandonment of the defense's previously suggested alternative for the military judge to reconsider and exclude all Mil. R. Evid. 413 evidence.

[17] On 16 June 2022, over eight months after trial, the military judge issued his written decision on the mistrial motion; we analyze it below. The military judge authenticated the record the same day.

> I will make it very easy for you and be very clear. You may not show slides 5, 7, 22, 52, 75, 103, 105, 112, and 114 to the panel. The court makes no ruling about what argument you may make to the panel, but you may not show those slides to the panel.

Later that morning, the military judge gave findings instructions to the panel. He addressed mistake of fact as to age, regarding victim 1, and mistake of fact as to consent, regarding the allegation of abusive sexual contact against victim 2. He also addressed, among other things, the allegation of indecent conduct toward victim 2, including the definition of indecent:

> 'Indecent' means that form of immorality relating to sexual impurity, which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or depraved morals with respect to sexual relations.
> . . .
>
> The [law] is not intended to regulate wholly private, consensual sexual activity. In the absence of an aggravating circumstance, private consensual sexual activity, including digitally transmitting a visual record, is not punishable as indecent conduct.
>
> Evidence has been introduced indicating that [victim 2] may have sent images of herself to the [appellant] prior to the alleged digital transmission of a visual recording on 9 February 2020. This evidence should be considered by you on the issue of whether the [appellant's] conduct in transmitting the visual recording was private, consensual activity.

With respect to the Mil. R. Evid. 413 evidence, the military judge only told the panel:

> You have heard evidence that the [appellant] may have committed another sexual offense, that is: evidence pertaining to [413 victim]. The [appellant] is not charged with that offense. You may consider the evidence of this other offense for its bearing on any matter to which it is relevant, to include its tendency, if any, to show the [appellant's] propensity to engage in sexual offenses. . . . You've heard evidence that the [appellant] was acquitted of that offense in a prior court-martial. You should

consider that result, but it's not binding on your determination of the evidence in the case.

In his overall evidentiary instructions, the military judge said:

Bear in mind that the arguments of counsel are not evidence. . . . [Y]ou must base the determination of the issues in this case on the evidence[18] as you remember it and apply the law as I instruct you.

In his findings argument, the trial counsel argued:

But in May of 2018, [appellant] was acquitted. He learned from those mistakes because in many ways, [the 413 victim] was not the perfect victim. Yes, she was physically easy to manipulate, but mentally she was 18, almost 19, an equal, a peer of the [appellant]. Intelligent; early college courses while in high school; an award from NASA; a software engineer. In many ways she was the wrong victim to choose and the [appellant] learned. Because what did she do? She immediately ran home to a mother who was watching out for her and told her what happened. And immediately that night, went and got a sexual assault forensic exam done and told the police. And there was a trial and he was acquitted. And he learned.

. . . .

A 15-year-old runaway who has an alcohol problem and drug dependency issues. Who's going to believe her Right? Who is going to believe her even if she comes forward? They didn't believe [the 413 victim]. Why would they believe [victim 1]? She was a more perfect victim.

. . . .

---

[18] We have reviewed the record in detail, searching for evidence introduced to the fact finder that appellant was acquitted in his first trial. While counsel for both sides mentioned the acquittal in their opening statements and closing arguments, neither side presented *evidence* of it.

They didn't believe [413 victim], why would they believe [victim 1]?

Later, arguing against the mistake of fact as to consent defense regarding victim 2, trial counsel said:

Another thing you can consider, his experience with raping [the 413 victim] and a court-martial from it. You can consider that when it was a reasonable mistake that he made. He'd already been court-martialed for it.

## LAW

### A. Military Rule of Evidence 401

Military Rule of Evidence 401 states evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."

### B. Military Rule of Evidence 403

Military Rule of Evidence 403 states the military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence.

### C. Military Rule of Evidence 413

Subject to three threshold requirements, Mil. R. Evid. 413 permits "[i]n a court-martial proceeding for a sexual offense, a military judge may admit evidence that the [appellant] committed any other sexual offense." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (The three threshold requirements for admitting evidence under Mil. R. Evid. 413 are "(1) the [appellant] must be charged with an offense of sexual assault; (2) the proffered evidence must be evidence of the [appellant's] commission of another offense of sexual assault; and (3) the evidence must be relevant under [Mil. R. Evid.] 401 and [Mil. R. Evid.] 402.").

"There is a need for great sensitivity when making the determination to admit evidence of prior acts that have been the subject of an acquittal." *United States v. Griggs*, 51 M.J. 418, 420 (C.A.A.F. 1999). In *United States v. Bridges*, we reiterated that when dealing with the "nettlesome problem" of considering the acquittal in weighing the probative value of the propensity evidence against any unfair prejudice that might result from its admission, there is an "expectation that judges deal with the admission of evidence previously the subject of an acquitted

charge very carefully." 74 M.J. 779, 780-81 (Army Ct. Crim. App. 2015), citing *Solomon*, 72 M.J. 176. In *Bridges*, we also noted a military judge who admits such evidence must carefully instruct the panel the appellant was "acquitted on a charge of the same allegation and the necessity to conscientiously limit consideration of that evidence accordingly." *Id.* at 781 (citing *United States v. Dowling*, 439 U.S. 342, 348–49 (1990); *Solomon*, 72 M.J. at 182; *Griggs*, 51 M.J. at 420).

### D. Fifth Amendment Due Process Clause

"Under the Due Process Clause of the Fifth Amendment, the government must prove a defendant's guilt beyond a reasonable doubt." *United States v. Lewis*, 69 M.J. 379, 383 (C.A.A.F. 2011).

### E. Prosecutorial Misconduct

Prosecutorial misconduct is reviewed "de novo[.]" *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Prosecutorial misconduct 'is action or inaction by a prosecutor in violation of some legal norm or standard . . . [such as] a constitutional provision, a statute, a Manual for Courts-Martial rule, or an applicable professional ethics canon. *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996). It is behavior by the prosecuting attorney that "overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Id.* at 12 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). The trial counsel "may prosecute with earnestness and vigor . . . but, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. *Berger*, 295 U.S. at 88.

"Where proper objection is entered at trial, this Court reviews alleged prosecutorial misconduct for prejudicial error." *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing Article 59, UCMJ, 10 U.S.C. § 859 (2000)). The prejudice inquiry balances three factors: "'(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Hornback*, 73 M.J. at 160 (citing *Fletcher*, 62 M.J. at 184).

Prosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant based on the evidence alone. *Hornback*, 73 M.J. at 160.

*F. Mistrial*

"The general rule is that a military judge's determination on a mistrial will not be reversed absent clear evidence of an abuse of discretion. " *United States v. Rudometkin*, 82 M.J. 396, 400 (C.A.A.F. 2022). "'In determining 'whether the military judge abused his discretion by not granting a mistrial, we look to the actual grounds litigated at trial.'" *United States v. Short*, 77 M.J. 148, 150 (C.A.A.F. 2018) (quoting *United States v. Diaz*, 59 M.J. 79, 91 (C.A.A.F. 2003)). If the military judge abuses his discretion, courts of criminal appeal are charged with fashioning an "appropriate remedy." *Diaz*, 69 M.J. at 97.

"While it is trite to say so, it is also true that a mistrial is a drastic remedy and is reserved for only those situations where the military judge must intervene to prevent a miscarriage of justice." *United States v. Garces*, 32 M.J. 345, 249 (C.M.A. 1991) (citing *United States v. Jeanbaptiste*, 5 M.J. 374 (C.M.A. 1978); *see also United States v. Morris*, 13 M.J. 297, 301 (C.M.A. 1982) (Cook, J., concurring in the result). When a military judge is satisfied that the Government has not engaged in intentional misconduct during the trial and concludes that an instruction will cure the potential error, such a procedure is "preferred." *United States v. Evans*, 27 M.J. 34, 39 (C.M.A. 1988) (citing *United States v. Escalante*, 637 F.2d 1197, 1202-03 (9th Cir. 1980); *Jeanbaptiste*, 5 M.J. at 374; *United States v. Simmonds*, 15 U.S.C.M.A. 641, 36 C.M.R. 139 (1966)). Therefore, the real question is "whether the curative instruction avoided prejudice to" the appellant, not whether the military judge abused his discretion. *Id.*

Absent evidence to the contrary, we generally assume a panel followed the military judge's instructions. *United States v. Hale*, 78 M.J. 268, 274 (C.A.A.F. 2019). This assumption is tempered by circumstances where a military judge's instructions are insufficient to "'unring the bell.'" *Diaz*, 59 M.J. at 92 (quoting *United States v. Armstrong*, 53 M.J. 76, 82 (C.A.A.F. 2000).

*G. Improper Argument*

Our superior court has provided guidance for analyzing improper argument:

> 'When the accused objects to an improper argument during his court-martial, we review the issue de novo.' In that de novo re-view, we determine whether any error materially prejudiced the appellant's substantial rights under Article 59, UCMJ, 10 U.S.C. § 859. 'We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.' On the

> other hand, if the [appellant] failed to object on this basis during the court-martial, we review the matter for plain error. In other words, the appellant 'must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'

*United States v. Norwood*, 81 M.J. 12, 19–20 (C.A.A.F. 2021) (citations omitted).

### H. Preservation of Error

"While there are no 'magic words' dictating when a party has sufficiently raised an error to preserve it for appeal, of critical importance is the specificity with which counsel makes the basis for his position known to the military judge." *United States v. Killion*, 75 M.J. 209, 214 (C.A.A.F. 2016) (citation omitted) (quoting *United States v. Smith*, 50 M.J. 451, 456 (C.A.A.F. 1999)).

### I. Indecent and Obscene Behavior

Whether a behavior is indecent or obscene is a matter of fact. *United States v. Negron*, 60 M.J. 136 (C.A.A.F. 2004). Videos viewed for "sexual gratification do not necessarily lose their First Amendment protection." *United States v. Kim*, __ M.J. ___, 2023 CAAF LEXIS 292* at *5 (C.A.A.F. 2023) (citing *United States v. Moon*, 71 M.J. 127, 131 (C.A.A.F. 2012).

### J. Cumulative Error

"Under the cumulative error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *United States v. Pope*, 328, 335 (C.A.A.F. 2011) (quoting *United States v. Banks*, 36 M.J. 150, 170–71(C.A.A.F. 1992).

## ANALYSIS

### A. Article 120 Offenses

#### 1. Mil. R. Evid. 401, 403, and 413

We review a military judge's decision to admit evidence under Mil. R. Evid. 413 for an abuse of discretion. *Solomon*, 72 M.J. at 179. Moreover, if the military judge articulates a properly conducted balancing test on the record, we will not overturn his or her Mil. R. Evid. 413 ruling absent a "clear abuse" of discretion. *Id.*, citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

The accumulation of errors started with the military judge's decision to admit Mil. R. Evid. 413 evidence regarding the 413 victim, though her allegations led to an earlier acquittal. In his analysis, the military judge credited the government's theory of the inference one could draw from the earlier result:

> [T]he Government argues that when considering that the charged offenses occurred after the acquittal, the [appellant's] tactics were emboldened and this factor weighs in favor of admissibility.

The military judge did not question whether this purported inference was logical or lawful; instead, he placed it on the scales as a counterweight to the defense's opposition to the evidence. The inference was not permissible for two reasons. First, the acquittal was not legally relevant to the issue of appellant's state of mind.[19][20] Using our common sense and knowledge of the ways of the world, we recognize an acquittal might embolden one to commit future misconduct. On the other hand, our experience and knowledge also tell us an acquittal is *at least equally likely* to encourage other behavior, including the avoidance of anything arguably unlawful. Viewed in this light, an acquittal does not create a "*tendency* to make [further misconduct] more or less probable[.]" Mil. R. Evid. 401 (emphasis added). Even assuming relevance *arguendo*, evidence of appellant's prior acquittal as used in this case does not survive the required Mil. R. Evid. 403 balancing test. Weighing the probative value of the Mil R. Evid. 413 victim's testimony against the risk of confusing the issues and creating a "distracting mini-trial" re-litigating appellant's prior acquittal and potentially misleading the members does not favor admission.[21]

---

[19] It was relevant for a different reason, though. The fact of acquittal called for a comparison of the different burdens of proof associated with a guilty finding (beyond a reasonable doubt) and other sexual misconduct evidence under Mil. R. Evid. 413 (preponderance of the evidence). The military judge's instructions did not convey this purpose.

[20] Both in their briefing and at oral argument, the government cited to *United States v. Payne*, 2013 CCA LEXIS 1017 (N.M. Ct. Crim. App. 12 Dec. 2013), in which our sister court held that the military judge properly concluded that appellant's acquittal of a prior sexual offense "may have strengthened the propensity of the accused." *Id.* at *17 (citation omitted). For the reasons expressed in this opinion, we fundamentally disagree with this proposition.

[21] We note the military judge's error regarding the Mil. R. Evid. 413 evidence is not limited to his initial ruling; even after learning of the substantial inaccuracies in the government's presentation and characterization of the evidence from the prior case

(continued . . .)

*Solomon*, 72 M.J. at 181 (citing *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005)). *Cf. Griggs*, 51 M.J. at 420 (finding the military judge did not abuse his discretion and exercised due sensitivity where the members received a stipulation of fact into evidence indicating the prior acquittal, testimony about the prior allegation ending in acquittal was appropriately limited, and the members were further instructed on the prior acquittal as part of limiting instructions).

Second, the inference was not permissible because it violated the Constitution. The Constitution's Due Process Clause guarantees a person shall be presumed innocent of a charge, unless and until the government proves their guilt beyond a reasonable doubt. Anchored on this principle, "not guilty," or "acquittal" are constitutionally required labels, to which a person is entitled when the government does not meet its burden of proof in a criminal trial. And, it follows that the government violates the Constitution when it derogates this label —and its accompanying protection—by using it as part of its body of proof of that person's alleged misconduct in a subsequent case.[22]

For these reasons, the military judge clearly abused his discretion in allowing the government to introduce evidence regarding previous alleged sexual misconduct toward the 413 victim. We do not mean to suggest that as a general principle evidence of a prior acquittal is always barred under Mil. R. Evid. 413. *See Solomon*, 72 M.J. at 182; *Griggs*, 51 M.J. at 420; *Bridges*, 74 M.J. at 780–81. Rather, we hold only that the military judge erred in this case in his finding that this evidence was admissible to show that the acquittal "emboldened" appellant.[23]

---

(. . . continued)
the military judge did not alter his ruling in light of new information. *See Solomon*, 72 M.J. at 182 ("Although we recognize the military judge would not have known when he admitted the M.R.E. 413 evidence that trial counsel would overdo it in this manner, the military judge failed to take actions during the trial to limit its overuse...").

[22] We are also perplexed by another part of the assistant trial counsel's assertion of similarities between the proffered Mil. R. Evid. 413 evidence and the charges at trial: "[several victims]are women of color[.]" How this was even arguably relevant is beyond us. After pointing out, "for the record, [appellant], is black[,]" the defense aptly noted such comparisons are not made when white persons are involved.

[23] Assuming *arguendo* it was not error for the military judge to allow the Mil. R. Evid. 413 evidence at this point, we later discuss more problems with it.

In addition, the military judge also did not exercise "great sensitivity" in addressing this evidence. Instead, by specifically affirming the government's misguided argument that the acquittal emboldened appellant's tactics, as evidenced by his written finding that "this factor weighs in favor of admissibility," the military judge gave insufficient weight to the guiding principles of *Griggs* and *Bridges*. Likewise, by allowing the government to argue: (1) that appellant "learned from his mistakes" after being acquitted; (2) the implication that the first panel got it wrong (arguing they "didn't believe" the 413 victim); and (3) the fact that appellant had been previously court-martialed for a sexual assault defeated any mistake of fact defense in this case, the military judge did not deal with this "nettlesome evidence" very carefully. *Bridges*, 74 M.J. at 780–81.

The military judge also did not instruct the panel of the necessity to "conscientiously limit consideration" of the acquittal evidence. As noted above, the military judge only gave the standard Military Judge's Benchbook instruction with two additional sentences indicating that appellant was acquitted of the prior offense, and that the panel "should consider the result from that prior court-martial, but it's not binding on your determination of the evidence in this case." In sum, given this deficient instruction, combined with his written and evidentiary rulings, the military judge abused his discretion by not treating the acquittal evidence with the required care and sensitivity.

## 2. Description of the DNA Report

The government helped set the stage for the military judge's erroneous Mil. R. Evid. 413 ruling. The trial counsel's Mil. R. Evid. 413 motion response materially mischaracterized the DNA report, editing a critical sentence to convey the impression that two people, MP and appellant, could have been the source of DNA found on MP's perianal swab. A plain reading of the report indicates that the DNA from that swab "originat[ed] from at least three individuals." The assistant trial counsel's editorial effort marked the first instance of prosecutorial misconduct.

## 3. Cross-Examination of Appellant

Rising to cross-examine appellant, the assistant trial counsel had every reason to know or certainly should have known at least two things: the contents of the DNA report regarding the 413 victim; and, that the DNA expert did not testify at the previous trial. We recognize the *trial counsel* wrote the government's Mil. R. Evid. 413 motion response only a few months earlier; it is reasonable to expect he too would have been familiar with the details of the previous prosecution, particularly what it did and did not include. So, we are left to wonder why he remained silent while the assistant trial counsel so plainly misstated the posture of the evidence from the earlier case.

The defense first objected[24] to assistant trial counsel's suggestion that evidence from the first trial indicated appellant's DNA was "in" the 413 victim's anus. Responding to the "in" versus "around" distinction, the assistant trial counsel proffered a different question, indicating "semen was found around the anal area[.]" For reasons not apparent from the record, the assistant trial counsel did not ask appellant this alternative question—that is good, because it too would have been improper; the DNA report did not state appellant's semen was found around the 413 victim's anus. Nonetheless, we are left with the fact that the prosecution materially mischaracterized the DNA report to the military judge.

As noted in the background section, the assistant trial counsel's misstatements about the DNA analysis persisted. She continued to inaccurately predicate her cross-examination on the idea that the prior trial included DNA expert testimony. Her questions and subsequent advocacy were simply wrong on multiple levels. They were wrong on the issue of *whether* there was DNA evidence in the previous trial: there was not. And, they were wrong on the issue of *what* the DNA report contained in the first place: it did not indicate DNA, semen, or sperm in the 413 victim's anus; and it did not indicate two DNA contributors around her anus either—it indicated three. Compounding these problems, the assistant trial counsel also emphatically and materially mischaracterized appellant's testimony, where he claimed he was not one of the contributors; the government's incorrect recitation would mean appellant indicated he was.

The assistant trial counsel explained her "wrong" note ("[C] testified") on the upper margin of DNA report caused her to mistakenly think the DNA expert testified at the first trial. We cannot see the connection. Without revealing C's entire name, it suffices for us to say the note referred to a person other than the DNA expert. At oral argument, government counsel indicated the assistant trial counsel might have seen the name beginning with "C," then conflated it with the DNA expert's name, causing the mistaken assertion that the DNA expert testified. This explanation - no more than a reasonable speculation - might fill the blanks of the assistant trial counsel's cursory explanation at trial, but it leaves undisturbed another multi-layered, material mistake.

The military judge's inquiry at trial and subsequent written reasoning also warrant comment. He asked the defense why they did not object to the cross

---

[24] It had not yet occurred to the defense that the DNA evidence and expert testimony *were not* part of the first trial.

22

examination about the DNA expert's purported previous testimony,[25] considering the government had not provided it to the defense before trial. This criticism was somewhat misplaced, though, for instead of making *that* objection, the defense predictably and reasonably requested the previous testimony under *Jencks*[26] and R.C.M. 701.

The military judge also focused on the assistant trial counsel's state of mind associated with her cross-examination (negligent, reckless, or intentional), drawing competing characterizations from the parties. The defense argued recklessness, while the assistant trial counsel attributed her mistake to negligence. We recognize R.C.M. 915(c)(2)(B) prohibits further proceedings when a mistrial is declared as "[t]he direct result of intentional prosecutorial misconduct designed to necessitate a mistrial[,]" but this record does not indicate a deliberate government plan to short-circuit the court-martial. In any event, the greater weight of prosecutorial misconduct jurisprudence does not demand different remedies for violations depending on whether they result from negligent mistakes, reckless gambles, or intentional decisions. This makes sense, for the nature and prejudicial extent of such inaccuracies matter greatly to a trial's fairness—their causes matter less. *See United States v. Rodriguez-Rivera*, 63 M.J. 372, 378 (C.A.A.F. 2006) (holding that in analyzing prosecutorial misconduct, "courts should gauge the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness."), citing *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003).

In his written decision,[27] the military judge did not mention "prosecutorial misconduct" or offer any analysis from that perspective; only one of the cases he cited made a passing reference to it. *United States v. Evans*, 27 M.J. 34, 41 (C.M.A. 1988) ("[H]ere we discern no prosecutorial misconduct like that in [another case

---

[25] We leave for another day a discussion of the hearsay implications these types of questions raise.

[26] This basis might not have been exactly on point, as the DNA expert was not actually on the stand. Nonetheless, if the prior testimony had existed, the government would have been required to disclose it. R.C.M. 701(a)(2).

[27] We recognize a military judge may wait to issue a written ruling any time before authentication, but it is not a best practice. Postponing the announcement of one's reasoning until such a late stage—particularly after entry of judgment—diminishes counsel's authority to request reconsideration or make post-trial motions, and the trial judge's authority to take corrective action. *See* R.C.M. 905(f) regarding requests for reconsideration and R.C.M. 1104(b)(2)(a) regarding time limits for post-trial motions.

involving a prosecutor's improper argument].") The defense cited several cases squarely dealing with prosecutorial misconduct: *United States v. Voorhees*, 79 M.J. 5 (C.A.A.F. 2019); *United States v. Andrews*, 77 M.J. 393 (C.A.A.F. 2018); and, *United States v. Halpin*, 71 M.J. 477 (C.A.A.F. 2013). However, the military judge did not cite them in his decision. On appellate review, it is difficult to defer to his decision when his written ruling did not address the fundamental problem specified by the defense.

The military judge's post-trial ruling also contained two critically mistaken findings of fact: that the "defense was fully aware of the prior court-martial" and "they did not object during the cross-examination of the [appellant] to any of the incorrect assertions about the DNA examiner testifying in the prior court-martial." To the contrary, as the assistant trial counsel was cross-examining appellant, the defense was not aware the DNA expert had not testified previously; and, the defense did object to the question that inaccurately described DNA found "in" the 413 victim's anus. The trial became surreal here, as the defense took vigorous exception to the government's inaccurate restatement of prior testimony that, unknown to the defense, never occurred in the first place.

Based on the circumstances, we hold the government's missteps in cross-examining appellant amounted to prosecutorial misconduct. We also find the curative instruction inadequate. By not stating the prosecution was directly responsible for the evidence that led to it, the military judge left open the possibility, for the panel's consideration, that appellant was somehow blameworthy for the instruction and the fact that the panel could not consider the DNA evidence they already heard. Further, while the military judge allowed the possibility for the defense to make its own presentation of the DNA analysis regarding the 413 victim, doing so raised the very real prospect of opening the door for the government to correct its previous inaccuracies and present DNA evidence anew. Of course, this would have required the military judge to at least alter the curative instruction, which would have likely confused matters further. Making these problems more vexing, they all related to Mil. R. Evid. 413 evidence associated with previous allegations that ended in acquittal. As a result, the proceedings went badly sideways, featuring a confusing, multi-faceted side-trial within a trial. While we do not find error in the military judge's decision not to declare a mistrial, the only acceptable remedy short of mistrial was to strike all Mil. R. Evid. 413 evidence from the panel's consideration.

### 4. Government's Closing Argument

For the same reasons discussed above about acquittal evidence and how it may not be used, we also find trial counsel's findings argument plainly erroneous. Without restating our analysis, we see no logical or legally permissible connection between the fact that appellant was found not guilty and the notion that he "learned"

how to commit additional misconduct; moreover, we find the government collectively applied this "logic" to all the Article 120 and 120b allegations. Similarly, we see no permissible connection between the fact of a previous trial—also guaranteed by the Constitution's Due Process Clause—and the prosecution's specific argument that it rendered a reasonable mistake of fact defense as to victim 2 unpersuasive. This rationale turned appellant's due process shield into a sword, and we are far from convinced that it resulted in no prejudice.[28] *See United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) ("We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.")

### 5. Cumulative Error

We leave for another day a discussion whether any of these kinds of errors would, on their own, yield the same appellate result. Here, their troubling nature and cumulative effect significantly diminish our confidence that, without them, the panel would have found appellant guilty of the charged Article 120 and 120b offenses. *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005) ("In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the [appellant's] substantial rights and the fairness and integrity of his trial."); *Banks*, 36 M.J. 150 at 171 (where an accumulation of errors deny appellant a fair trial, the court is required to reverse the decision below); *Pope*, 69 M.J. at 335. *See also Norwood*, 81 M.J. at 19-20; *Cf. Pabelona*, 76 M.J. at 12 (holding that prosecutorial misconduct will require reversal when "the trial counsel's [conduct], taken as a whole, [was] so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone."), citation omitted. In this case, the military judge either made no efforts to cure the misconduct or took measures that were inadequate, and the weight of the evidence supporting these convictions was far from overwhelming.

---

[28] Following *Killion*, we conclude the defense adequately preserved this error for appellate review by objecting to the slide that proffered links between appellant's previous acquittal and a propensity to commit additional misconduct. It is unclear why the military judge sustained the objection to the slide—presumably because of its objectionable content—yet did not preempt the government from subsequently verbalizing the objectionable argument that appellant's previous acquittal was an incriminating learning experience. We recognize he left open the door for defense counsel to object again during the government's argument. However, the defense made their opposition abundantly clear in their pre-argument objection.

Accordingly, we will set aside the guilty findings for Specifications 2 and 3 of Charge I and Charge I, and the Specification of Additional Charge I and Additional Charge I. We recognize Specifications 2 and 3 of Charge I were alleged in the alternative, and the panel found appellant guilty of both. The military judge conditionally dismissed Specification 3, depending on Specification 2's survival on appellate review. The panel's two guilty findings regarding Charge I, however, preceded that dismissal; we will set both guilty findings aside. We acknowledge the government alternatively charged appellant with non-forcible sexual activity with an underaged person, and the government did not explicitly argue that appellant's prior acquittal undercut his reasonable mistake of fact defense as to victim 1's age, potentially leaving open the possibility that we could affirm the specification that the military judge conditionally dismissed pending appellate review. However, considering appellant's record testimony that, among other things: (1) he thought victim 1 was 18; (2) she told him she was 18; and, (3) appellant suggested she enter the store and purchase an item that would have required proof that she was at least 18, we find there is at least some evidence supporting a mistake of fact as to age defense. We also find, absent the errors, a reasonable fact finder might have determined appellant proved by a preponderance of the evidence that he was mistaken about victim 1's age. R.C.M. 916(j)(2).

*B. Indecent Conduct Offense*

Beyond the Article 120 and 120b offenses, the case presents an additional error requiring relief. Our superior court in *Kim* held that, depending on the circumstances, some alleged misconduct may occupy a constitutional gray area under the First Amendment. In other cases, it is clear the prosecution of certain misconduct does not infringe on the First Amendment. *United States v. Lindor*, __ M.J. __ ARMY 20210520, 2023 CCA LEXIS 258* at *12 (Army Ct. Crim. App. 14 June 2023).

In *Kim*, our superior court held appellant's conduct in conducting internet searches for "rape sleep," "drugged sleep," and videos "depicting simulated vulgar sex scenes involving sleep or sex with an individual that was pretending to be asleep" constituted a "constitutional gray area." *Kim*, 2023 CAAF LEXIS 292* at *3-4, *8. The CAAF held the military judge erred in a guilty plea inquiry by only providing appellant with the statutory elements of Article 134 indecent conduct. Given the "constitutional implications of his situation," the CAAF held the military judge should have additionally "discussed with appellant the existence of constitutional rights relevant to his situation to make sure appellant understood why his behavior under the circumstances did not merit such protection." *Id.* at *9-10.

Simply put, if searching the internet for "rape sleep," "drugged sleep," and videos "depicting simulated vulgar sex scenes" falls within a "constitutional gray area," appellant's sending the videos to victim 2 also merits constitutional

protection. This is especially true where: (1) victim 2 had reached the age of lawful consent to sexual activity; (2) she told appellant she did not care when he described the videos as depicting him and another person in activity not amounting to sexual intercourse; and, (3) she continued to communicate with appellant in a way that indicated she was still interested in sexual activity with him.[29]

We recognize appellant's lack of objection to the military judge's findings instructions constitutes waiver. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (holding that by "'expressly and unequivocally acquiescing' to the military judge's instructions, [a]ppellant waived all objections to the instructions"). However, under the version of Article 66, UCMJ, in effect at the time this offense was committed,[30] we have the discretion to treat waived claims as if they were forfeited at trial. *United States v. Conley*, 78 M.J. 747, 749 (Army Ct. Crim. App. 2019) (citing *United States v. Britton*, 26 M.J. 24, 27 (C.M.A. 1988)) (holding that even where an issue is both correct in fact and correct in law, the third "should be approved" prong of Article 66, UCMJ "allows us to, in our discretion, treat a waived or forfeited claim as if it had been preserved at trial.").

Given the due process issues, we find this is one of the rare cases warranting exercise of our Article 66 "should be approved" authority to reach the waived instructional error. *See United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006) (citing *United States v. Jackson*, 6 M.J. 116, 117 (C.M.A. 1979) (holding the failure to provide correct and complete instructions to the panel before deliberations begin may amount to a denial of due process); *United States v. Jones*. 78 M.J. 37, 44 (C.A.A.F. 2018) (finding there is a "presumption against finding a waiver of constitutional rights.").

In *Wolford*, 62 M.J. at 420, our superior court held, under the plain error standard, claimed instructional errors "must be tested for prejudice under the standard of harmless beyond a reasonable doubt," and that such inquiry is "whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction

---

[29] We acknowledge our sister court's decision in *United States v. Carlile*, ACM 40053, 2022 CCA Lexis 542 (A.F. Ct. Crim. App. 21 September 2022), and our superior court's decisions in *United States v. Rollins*, 61 M.J. 338, 345 (C.A.A.F. 2005), *United States v. Baker*, 57 M.J. 330, 335–36 (C.A.A.F. 2002), and *United States v. Sadler*, 29 M.J. 370, 374 (C.M.A. 1990), but find all of those cases to be distinguishable.

[30] *See* P.L. 116-283, Section 542(e)(2), 134 Stat. 3611-12 (amendment to Article 66(d) shall take effect on 1 January 2021, and shall apply with respect to any case in which every finding of guilty entered into the record "is for an offense that occurred on or after that date.").

or sentence." (citations omitted); *see also United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)) (holding the plain error harmless beyond a reasonable doubt prejudice standard "is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction"). Applied here, given the "constitutional implications of [the] situation," we are not convinced that the military judge's insufficient instructions about the potential First Amendment implications of appellant's conduct did not impact the guilty finding. Accordingly, we find the error was not harmless beyond a reasonable doubt, and we will set aside the guilty finding for the Specification of Additional Charge II and Additional Charge II.

## CONCLUSION

The findings of guilty as to Specification 1 of Charge III and Charge III, and the Specification of Charge V and Charge V are AFFIRMED. The findings of guilty as to Specification 2 and 3 of Charge I and Charge I, the Specification of Additional Charge I and Additional Charge I, and the Specification of Additional Charge II and Additional Charge II are SET ASIDE. The sentence is SET ASIDE. A rehearing on Specification 2 and 3 of Charge I and Charge I, the Specification of Additional Charge I and Additional Charge I and the Specification of Additional Charge II and Additional Charge II, and the sentence is authorized. If a rehearing on the set aside charges and specifications is deemed impracticable, a rehearing on the sentence only is authorized.

Judge MORRIS and Judge ARGUELLES concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court